UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

C.S. and D.S., Individually and as Parents      :
and Legal Guardians of A.S., a Minor,           :
      Plaintiffs,                               :
                            :
          v.                                   :         C.A. No. 19-637WES
                            :
THE JOHNSTON SCHOOL DISTRICT            :
alias JOHNSTON PUBLIC SCHOOLS,           :
      Defendant.                                :

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

      The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq*.,

requires that students with certain disabilities must be provided a "'[f]ree appropriate public

education' ("FAPE") in the '[l]east restrictive environment' ("LRE") appropriate for each

student." C.D. by & through M.D. v. Natick Pub. Sch. Dist., 924 F.3d 621, 624 (1st Cir. 2019),

cert. denied, 140 S. Ct. 1264 (2020) (quoting 20 U.S.C. § 1412(a)(1), (5)).  This case arises under

IDEA; it is focused on the sixth-grade program offered by the Johnston School District

("District") to A.S., a student diagnosed with moderate autism spectrum disorder ("ASD").

Following a ten-day administrative hearing ("Hearing"), a Hearing Officer found that, with a to-

be-completed individualized educational plan ("IEP"), the District's Life Skills Program at the

Ferri Middle School ("Life Skills"), can provide A.S. with a FAPE in the least restrictive

environment, as well as that the out-of-district placement for which A.S.'s parents ("Parents")

advocated – the Sargent Rehabilitation Center ("Sargent") – does not comply with IDEA's LRE

requirement because it is not a community-based school and cannot afford opportunities for in-school interaction with neurotypical peers.[1]  ECF No. 8 at 4, 56 ("HO Dec.").

Questioning the Hearing Officer's determination that placement in Life Skills could meet A.S.'s socialization needs, the Parents initiated this case to challenge the Hearing Officer's factual findings.  The parties' cross motions for summary judgment have been referred to me for report and recommendation.  ECF Nos. 36, 42.  Referred for determination is the Parents' motion to supplement the record (ECF No. 34) with additional evidence – a one-page outline of the District's pre-hearing proposal for A.S.'s sixth grade plan – that the parties had initially used to question witnesses but then had jointly withdrawn during the Hearing.  For the reasons that follow, I have granted the motion to supplement by a separate text order that issued today.  Finding (as the Parents concede) that the Hearing Officer made no errors of law, as well as that his factual findings are amply supported by a preponderance of the evidence and that the additional evidence is relevant, credible and persuasive, but also entirely supportive of the Hearing Officer's decision, I recommend that the Parents' motion (ECF No. 36) be denied and the District's motion (ECF No. 42) be granted.

## I.      Standard of Review

Because this is an IDEA action challenging the Hearing Officer's decision, the Court:

(i) shall receive the records of the administrative proceedings;
(ii) shall hear additional evidence at the request of a party; and
(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

---

[1] As defined during the hearing, "neurotypical peers" is a term used in the context of ASD to refer to children whose neuropsychological development is within the normal range.  E.g., Day 5 (Davila) at 36.  "Like peers" are children diagnosed with ASD.  E.g., Day 2 (Davila) at 118.

20 U.S.C. § 1415(i)(2)(C).  The parties seeking to overturn the Hearing Officer's decision (here, the Parents) bear the burden of proof.  Roland M. v. Concord Sch. Comm., 910 F.2d 983, 991 (1st Cir. 1990).

In approaching the requirement that its decision must be based on the preponderance of the evidence, the Court must use an "intermediate standard of review," which falls between administrative deference and de novo review.  Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993); see Roland M., 910 F.2d at 989 ("The court's principal function is one of involved oversight.").  The Court's "independence is tempered by the requirement that it must give 'due weight' to the hearing officer's findings," which "reflects the concern that courts not substitute their own notions of educational policy for that of the state agency, which has greater expertise in the educational arena."  Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm., 361 F.3d 80, 83-84 (1st Cir. 2004) (quoting Roland M., 910 F.2d at 989).  The Court must give "special weight" to the Hearing Officer's credibility findings to the extent that they are based on his "ha[ving] heard live testimony."  Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S., 381 F.3d 194, 199 (3d Cir. 2004).  Similarly, the Court must "afford deference to findings that credit local educators over the testimony of outside experts" who have spent little time with the child.  Joanna S. v. S. Kingstown Pub. Sch. Dist., C.A. No. 15-267M, 2017 WL 9324761, at *23 (D.R.I. Jan. 11, 2017), adopted, 2017 WL 1034528 (D.R.I. Mar. 17, 2017).  For an IDEA case presented on the administrative record, "the parties' cross-motions for summary judgment serve as a procedural device, in which the burden of proof rests with the party seeking to overturn the Hearing Officer's Decision."  S.C. by & through N.C. v. Chariho Reg'l Sch. Dist., 298 F. Supp. 3d 370, 379 (D.R.I. 2018).

In addition to the administrative record, IDEA requires the Court properly to consider "additional evidence" submitted by the parties.  Doe v. Cape Elizabeth Sch. Dist., 832 F.3d 69, 83 (1st Cir. 2016) (quoting 20 U.S.C. § 1415(i)(2)(C)).  In deciding whether to accept additional evidence, the trial court is left to its discretion, mindful that IDEA contemplates it as a "a hedge against injustice," Roland M., 910 F.2d at 997, but also that such evidence may not change the character of the hearing from one of review to a trial *de novo*, inflict unfairness on the other party or inappropriately consume scarce judicial resources.  Town of Burlington v. Dep't of Educ. for Mass., 736 F.2d 773, 791 (1st Cir. 1984), aff'd sub nom. Sch. Comm. of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359 (1985).  For example, if the "additional evidence" is testimony from witnesses seeking to repeat or embellish their hearing testimony or is a new witness who was not called in a willful election to leapfrog the agency proceedings, the court may exercise its discretion to refuse to allow such testimony.  Roland M., 910 F.2d at 997; Burlington, 736 F.2d at 790.  On the other hand, if the post-hearing evidence is a document that impacts the "persuasiveness of the hearing officer's decision," it would be error to ignore it. Doe, 832 F.3d at 84 (error to ignore affidavit with new test results proffered to bring court up to date on child's progress).  When the Court exercises its discretion to accept "additional evidence," the evidence should be considered as long as it is not unfairly prejudicial to do so; if it is credible and persuasive, the Court should make an independent judgment, with less deference to the Hearing Officer who did not take the additional evidence into account.  Id.; see Lessard v. Wilton-Lyndeborough Coop. Sch. Dist., Civil No. 06-cv-423-JD, 2007 WL 2156365, at *2 (D.N.H. July 24, 2007) (court accepts additional non-testimonial evidence, subject to right of district to argue that it is irrelevant, unpersuasive or unfairly prejudicial).

## II.    Applicable IDEA Law

IDEA offers states federal funds for the education of children with disabilities in exchange for the states' commitments to comply with IDEA's directives, including its FAPE and LRE requirements.  See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 295 (2006); C.D. by & through M.D., 924 F.3d at 624.  FAPE "comprises 'special education and related services' – both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction."  Fry v. Napoleon Cmty. Sch., 137 S. Ct. 743, 748-49 (2017) (quoting 20 U.S.C. §§ 1401(9), (26), (29)).  "The 'primary vehicle' for delivery of a FAPE is an IEP."  D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 34 (1st Cir. 2012) (quoting Lessard, 518 F.3d at 23).  An IEP is a "comprehensive plan" that is developed by the child's "IEP Team (which includes teachers, school officials, and the child's parents)" and "must be drafted in compliance with a detailed set of procedures."  Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 994 (2017) (internal quotation marks omitted).  The services offered in an IEP amount to a FAPE if they are "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  Id. at 1001; see Johnson v. Bos. Pub. Sch., 906 F.3d 182, 196 (1st Cir. 2018) (even "slow" progress is sufficient to constitute a "meaningful educational benefit" when viewed in light of child's individual circumstances).  Once the content of the IEP is finalized, the child is placed in accordance with the IEP; until the IEP is complete, no placement can be made.  T.B. ex rel. N.B. v. Warwick Sch. Dep't, No. Civ.A. 01-122T, 2003 WL 22069432, at *5 (D.R.I. June 6, 2003), aff'd sub nom. Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm., 361 F.3d 80 (1st Cir. 2004).

IDEA requires that disabled children must be educated in LRE, the "[l]east restrictive environment" appropriate for each child.  20 U.S.C. § 1412(a)(5).  It mandates:

> To the maximum extent appropriate, children with disabilities . . . are educated
> with children who are not disabled, and special classes, separate schooling, or

other removal of children with disabilities from the regular educational
environment occurs only when the nature or severity of the disability of a child is
such that education in regular classes with the use of supplementary aids and
services cannot be achieved satisfactorily.

Id. § 1412(a)(5)(A).  This LRE requirement embodies the "preference" for "mainstreaming"
students with disabilities in "the regular classrooms of a public school system."  Bd. of Educ. of
Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 202-03 (1982); see Endrew F. ex rel.
Joseph F., 137 S. Ct. at 999 ("IDEA requires that children with disabilities receive education in
the regular classroom 'whenever possible'").  To maximize mainstreaming, every IEP must
specify "the extent, if any, to which the child will not participate with nondisabled children in the
regular class."  Parent/Prof'l Advocacy League v. City of Springfield, 934 F.3d 13, 19 (1st Cir.
2019) (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(V)).  "[T]he desirability of mainstreaming must be
weighed in concert with the Act's mandate for educational improvement."  C.D. by & through
M.D., 924 F.3d at 625.

When the issues in an IDEA case are forward looking, courts generally look to the final
version of the most recent IEP to assess what was the school system's "last, best offer."  C.G. ex
rel. A.S. v. Five Town Cmty. Sch. Dist., 513 F.3d 279, 285 (1st Cir. 2008).  While this approach
is not mandated in this Circuit, it is commonly deployed because it affords a clear record of what
placements and educational services were offered.  Id.  However, if there is no "last, best offer"
because the parents initiated the adversary process in advance of the development of a final IEP,
it makes very little sense to consider only the latest version of the IEP.  Id. at 286.  This is
especially true where the school system has acted expeditiously, and the development of a final
IEP has been frustrated by the parents' refusal to cooperate fully in the collaborative process.
Id.; see Roland M., 910 F.2d at 995 (parents should not prevail when inadequacy of IEP was
"created by their own obstructionism").  In such circumstances, the hearing officer – and the

6

reviewing court – should not restrict the inquiry to the partially completed IEP but rather should look at the totality of the circumstances, consider extrinsic evidence if necessary, and judge the parents' claims accordingly. C.G. ex rel. A.S., 513 F.3d at 287.

## III.   Factual Background[2]

### A.   Overview of A.S.'s Medical and Educational History

At the age of four, A.S. was evaluated by Dr. David Dinklage, a well-qualified neuropsychologist. P Ex. 6; P Ex. 1 (Curriculum Vitae). Because of delayed speech, marked communication difficulties and lack of social involvement and reciprocal communication, Dr. Dinklage diagnosed pervasive developmental disorder consistent with mild to moderate ASD. P Ex. 6 at 3. He recommended immediate intensive home-based services based on an instruction method called applied behavior analysis ("ABA").[3] Id. For school, Dr. Dinklage recommended placement in a "true integrated classroom with both normal developing and special education peers." Id. at 4. Consistent with Dr. Dinklage's recommendations, A.S. began intensive ABA at home and entered kindergarten in an integrated class with a full-time aide and the school day shortened to accommodate the intensive ABA schedule. The first IEP of record for A.S. provides for speech and language therapy and goals that are focused on language, working

---

[2] I refer to the Parents' hearing exhibits as "P Ex." and to the District's hearing exhibits as "D Ex."

[3] According to the record, ABA is "the only methodology that's empirically validated to be effective with kids on the autism spectrum." HO Dec. at 8. ABA is administered under the supervision of a licensed board-certified behavior analyst ("BCBA"). Id. at 8-9, 37. For A.S., ABA services focused "on reducing negative behaviors" and on "chaining together more positive and pro-social behavior." E.g., P Ex. 6. As Dr. Dinklage recommended, from age four through the date of the hearing, A.S. received intensive ABA services at home, with his time at school reduced to extend the time available for ABA. Day 1 (C.S.) at 104. As Dr. Dinklage also recommended, A.S.'s school-based program consistently required coordination with the home-based ABA. E.g., P Ex. 15. The BCBA in charge of the home-based ABA services (Ms. Karen Nault during the period in issue) attended and provided input that was considered during A.S.'s IEP meetings. Day 5 (Nault) at 65-66. As the parties clarified during the hearing before me, while these home-based ABA services addressed some of the same ASD symptoms (ASD behaviors and impaired socialization) that were and are also the focus of A.S.'s educational program, home-based ABA is not part of A.S.'s educational program.

cooperatively with peers, and game playing.  P Ex. 7.  For evaluations, A.S.'s IEP Team relied

on Dr. Dinklage's neuropsychological assessment, as well as an educational evaluation.  Id.

Dr. Dinklage's second neuropsychological evaluation, performed in 2014 when A.S. was

six, shifted A.S.'s diagnosis to ASD in the mild to moderate range due to ongoing "pervasive

difficulties in the context of very intensive ABA therapy over several years."  P Ex. 5.  Dr.

Dinklage urged that intensive ABA continue.  For school, he recommended continuing the

inclusion classroom with a one-on-one aide, speech and language therapy, occupational therapy

and "social skills training."  Id.  A.S.'s IEPs for this period are largely consistent with Dr.

Dinklage's recommendations in that A.S. was placed in an inclusion class with a special

educator, a one-on-one aide, a behavior technician and a speech and language therapist, although

occupational therapy was not added until A.S. started second grade.  P Exs. 7-12.  These IEPs

had goals related to communication, including the ability to engage in collaborative conversation

with peers and adults.  Id.  While no separate social skills training goals were incorporated into

them, Dr. Sally Mitchell (a licensed school psychologist who was the District's Director of

Special Education) explained that "socialization can occur in a number of different ways, a

number of different methods by a number of different staff, and the entire team was providing

those opportunities: [c]onstant coaching, directing, suggesting, facilitating opportunities."  Day 4

(Mitchell) at 27.  That is, because socialization was embedded in the program, it was not written

into the IEP.  Day 7 (Mitchell) at 112-13 (socialization instruction is embedded "throughout the

course of the day, when the student has opportunities to interact with either any peers or adults,

then the student is coached to practice those skills").

When A.S. turned eight, he entered second grade at the District's Winsor Hill Elementary

in an inclusion class, with intensive ABA services at home and the school day shortened to fit

ABA into his schedule.  Unfortunately, during second grade, A.S.'s ASD symptoms exacerbated.
As a result, part-way through the school year, the IEP was altered to increase the amount of time
when he was removed from the inclusion classroom for academic instruction; he began to spend
a large part of every school day in an isolated classroom with a special educator (Ms. Jasmine
Davila), several aides and, at most, one or two other students.  P Ex. 13.  A.S. remained with
neurotypical peers for the start of the school day and for non-academic activities (e.g., lunch and
recess) as his school day gradually lengthened.  Day 3 (Davila) at 117-22.  Ms. Davila
incorporated socialization by bringing "in some familiar faces, and . . . there would be small
group games, reading lessons, things like that, so there were socialization opportunities, yes."
Day 2 (Davila) at 79-80.

At the end of second grade (in April 2016),[4] Dr. Dinklage performed his third evaluation
of A.S.  P Ex. 4.  The resulting report reflects Dr. Dinklage's concerns with A.S.'s intensifying
autism symptoms.  Id. ("he has not made the progress one might have hoped for" . . . "[h]e
declined slightly relative to peers on both cognitive and academic testing," with "symptom
severity . . . somewhat more severe").  Based on these concerns, Dr. Dinklage recommended a
shift in educational placement – out of the inclusion class because he was "not truly making use
of neuro-typical peers in terms of increased socialization or modeling" and into a "substantially
separate school program for Autistic children."  Id.  However, in August 2016, Dr. Dinklage
backed away from this recommendation, writing at the request of the Parents to ask that A.S.
remain in the same classroom with the same special education teacher (Ms. Davila).  D Ex. 75.
Dr. Dinklage acknowledged that this shift was based on the preference of the Parents and would

---

[4] Also at the end of second grade, the District referred A.S. to the Wolf School for a possible placement; the Wolf School declined as "[h]is needs exceed what our program provides."  P Ex. 27.

not be the "private setting specializing in autism" he had suggested in April; he concluded, "I understand [the Parents'] reservations and can endorse their efforts."  Id.

Consistent with Dr. Dinklage's revised endorsement of the Parents' approach, A.S.'s IEPs for third and fourth grades continued placement in an inclusion classroom, with most of his school day (still shortened due to home-based ABA) in an isolated room with Ms. Davila and other professionals and (at most) two other students for individualized or small group instruction for academic subjects.  P Exs. 14-16; see D Ex. 78 (at June 2016 IEP meeting, Parents concur in decision to "follow the same program"); D Ex. 62 (in February 2017, Parents express view that A.S. continues to need specialized individual instruction, which has resulted in "positive changes").  A.S.'s socialization needs continued to be addressed in "creative ways" as opportunities arose throughout the school day, such as while passing in the hall and during recess and "itinerant" classes (library, art, music and physical education).  E.g., Day 2 (Zarcaro) at 28-33, 37-41 ("the socialization piece happening within like the inclusion classroom . . . we were going to try to get A.S. to socialize . . . with the adults, the teachers, his peers"); Day 3 (Davila) at 117-22 ("other students would come in and play games with him . . . [u]sually the same girls . . . sometimes a couple of the boys").  A.S.'s need for instruction in communication skills and social pragmatics continued (as it had since A.S. was four) to be addressed by the speech/language therapist whose goals and services were consistently part of his IEP.  Day 9 (Storey) at 73, 86-87.

While A.S. continued to struggle, he also made progress: the third grade IEP notes that, "[t]hrough problem solving and many team meetings, the IEP team developed a strong and effective school-based team and program for [A.S.] that began to show academic, behavioral & social progress."  E.g., P Ex. 14.  Ms. Davila testified that over the years, there was progress with

regard to socialization in that A.S.'s ability to interact with others improved.  Day 2 (Davila) at

84; <u>see</u> Day 5 (Davila) 14-15 ("He interacts more spontaneously").  The speech/language

therapist who had worked with A.S. since he was four confirmed that "through the years you see

that he's gaining more ability to use those expressive skills . . . quite a progression in his

language skills over time."  Day 9 (Storey) at 94.  As to academic progress, while it was

objectively "minimal," Ms. Davila explained that, "it's progress, especially compared to where

he was before."  Day 5 (Davila) at 55.  When the District added adaptive physical education

services provided by Ms. Michelle Brennan, which allowed socialization with neurotypical

peers, A.S. also made progress in that class.  Day 4 (Brennan) at 46-48.

      Throughout this period, the Parents and the IEP Team struggled with how best to balance

A.S.'s program: how much time to devote to home-based ABA, how much time to devote to

academics, and how to address A.S.'s socialization needs, including whether to add specific

goals and services and how much time to devote to other school activities that would afford

opportunities for socialization with neurotypical peers, such as itinerants.  For example, at times

the Parents asked for social goals, Day 4 (Mitchell) at 36, while at others, the Parents were

averse and the educators urged more attention to socialization, <u>id.</u> at 25-27; the Parents

consistently opted out of proffered summer services, so that A.S. could have intensive full-time

ABA throughout the summer;[5] they also held A.S. out of school trips and asked the District to

cancel A.S.'s participation in several itinerant classes.  <u>E.g.</u>, D Ex. 91.  School-based members of

the IEP Team urged that A.S. remain in these activities to increase his opportunities for

socialization.  <u>E.g.</u>, <u>id.</u>; Day 2 (Davila) at 87-89; Day 3 (Davila) at 121-24.  As A.S. was heading

into fifth grade, his IEP called for placement in a special class with one-on-one "or small group

---

[5] While A.S. qualified for special education services during each summer, the Parents consistently declined, opting
instead to increase home-based ABA services during the summer months.

support and instruction in reading, writing, math, OT, communication, and behavior."  P Ex. 19.

Ms. Davila continued as his special education teacher.

In June 2018, between fourth and fifth grade (when A.S. was ten), Dr. Dinklage

performed his fourth neuropsychological evaluation.  P Ex. 3.  During a difficult testing session,

A.S. exhibited self-harming behaviors that Dr. Dinklage had not previously observed; the test

results reflected cognitive and academic decline relative to peers, with more severe ASD

symptoms.  Id.  Dr. Dinklage expressed serious concern about A.S.'s need for a "breakthrough"

and recommended adjustments to the home-based ABA services; he also reverted to his prior

educational recommendation for placement in a "substantially separate school program for

Autistic children."  Id.  For reasons that the record does not reveal, Dr. Dinklage's fourth

evaluation was not sent to the District until after the fifth-grade year had begun.  Day 2 (Davila)

at 95; see D Ex. 65 (on August 8, 2018, Parents inform District of Dinklage evaluation and, on

August 12, 2018, advise that they will ask Dr. Dinklage to send it to them).  Soon after it was

sent, on October 3, 2018, Dr. Dinklage did an observation of A.S.'s fifth grade academic

instruction.  In November 2018, Dr. Dinklage supplemented his June 2018 evaluation with a

letter expressing serious concern that A.S. was effectively isolated, interacting only with the

special education teacher and the behavior technician.  P Ex. 2.  Sounding a warning, the letter

recommends that, for A.S., "[s]ocial goals need to be front and center" and that the District

should conduct a comprehensive review of how to "implement social interaction interventions,

foster symbolic thinking, and develop daily living skills."  Id.  Dated November 15, 2018, the

letter reiterated Dr. Dinklage's now urgent recommendation that A.S. be placed in a classroom

designed specifically for ASD children.  Id.

Immediately following receipt of Dr. Dinklage's letter, the District reacted.  Beginning on November 16, 2018, A.S.'s IEP Team met five times to discuss how to adjust A.S.'s IEP for fifth grade in light of Dr. Dinklage's concerns, and then to plan for the transition to sixth grade and middle school.  Day 7 (Mitchell) at 39-51.  At the initial meeting, Dr. Dinklage's recommendations and A.S.'s need for more socialization, including the possibility of social work goals, were discussed; consistent with Dr. Dinklage's suggestion for a comprehensive review, the IEP Team decided to bring in the Autism Project[6] to "consult on [A.S.]'s learning environment."  D Ex. 29.  At the December 2018 IEP meeting, with the Autism Project's work not yet completed, the Team discussed further A.S.'s need for social work services and social goals.  D Ex. 28.  At the February 2019 IEP meeting, the Autism Project's completed report and draft social work goals were reviewed; the special education teacher, Ms. Davila, advised that she would incorporate the Autism Project's social emotional recommendations into A.S.'s daily routine.  D Ex. 27.  At the April 1, 2019, IEP meeting, social skills goals and social worker services were finalized, and Ms. Davila provided the Parents with detailed information about A.S.'s opportunities for socialization with typical peers.  D Ex. 23.  The resulting IEP was finalized and implemented for the remainder of fifth grade, leaving the sixth grade IEP to be developed.  Id.; Day 7 (Mitchell) at 30, 46.  Near the end of the April 1, 2019, IEP meeting, the Parents advised that they had viewed the District's "middle school classroom" (Life Skills) and that they did not consider it appropriate for A.S.; instead, they asked the Team to consider placement at Sargent for sixth grade.  D Ex. 23.

---

[6] The Autism Project is "a state agency known for working with and providing supports and recommendations for not just students, but individuals with autism, as well as families of individuals with autism."  Day 2 (Davila) at 124; see D Ex. 20.  It "is an organized group that offers supports to parents, students, and schools in support of individuals who are ASD, autism spectrum disorder."  Day 7 (Mitchell) at 71.

The topic of the sixth grade IEP and placement was continued for further discussion at a meeting to be held on May 15, 2019.[7]  To prepare for this discussion, several of the District's IEP Team members (Dr. Mitchell, Ms. Davila, Ms. Susan Storey, Ms. Michele Zarcaro) visited the two placements under consideration for A.S. – Life Skills and Sargent.  D Exs. 95, 96.  At the May 15, 2019, IEP meeting, the school-based Team members tried to present A.S.'s present levels, including A.S.'s socialization progress following implementation of the IEP finalized for fifth grade,[8] and "repeatedly attempted to present the draft IEP."  D Ex. 17.  However, the Parents' attorney cut off all such discussion and insisted that each school-based Team member must state her perspective on placement at Sargent.  Id.  After each stated that she considered Life Skills appropriate, in that it would afford A.S. "powerful social and emotional learning opportunities in a program with like peers and peer models," while those who had familiarity with Sargent opined that it would not offer FAPE, the Parents ended the meeting.  D Exs. 16, 17.  As a result, "[a]n IEP was not developed; there were no changes to the previous IEP draft [P Ex. 20; D Ex. 15]."  D Ex. 17.  Soon after, in early June 2019, the Parents filed their request for an impartial due process hearing, initiating this proceeding.

     B.    <u>District's Proposal for Sixth Grade – Life Skills Program at Ferri Middle School</u>

As described by Dr. Mitchell, the District's Director of Special Services and a licensed school psychologist with more than thirty years of experience,[9] Life Skills is "a substantially separate school program that is designed specifically for students with ASD symptoms" and would be a placement that is consistent with Dr. Dinklage's 2018 recommendation.  Day 7

---

[7] This meeting was originally set for late April but was pushed to May 15, 2019, to accommodate the Parents' attorney.  D Ex. 98.

[8] The District's subsequent progress reports, prepared in June 2019, reveal that A.S. made progress on the goals in the April 1, 2019, IEP.  P Exs. 54-58; <u>e.g.</u>, P Ex. 55 ("nice gains" . . . "nice progress").

[9] The Hearing Officer found Dr. Mitchell to be an expert "in this area," as well as that her "experience is impressive and her testimony persuasive."  HO Dec. 56; Day 4 (Mitchell) at 12.

(Mitchell) at 78.  For socialization, Life Skills would expose A.S. to an array of opportunities to interact with neurotypical peers (during itinerants, lunch, in the hallways and at schoolwide events and assemblies), including during Life Skills' "reverse mainstreaming," where "typical peers are invited into the classroom to interact, socialize, and assist students." Id. at 77, 81.  A.S. would also be provided with the opportunity to socialize with like peers in the Life Skills classroom, as well as through more targeted opportunities with the school social worker. Id. at 68.  A.S. could participate in Ferri's "very active and exciting unified sports program" for like and typical peers, as well as in the Rhode Island Dare to Dream Conference, a youth leadership conference for students with disabilities in which the District has been active. Id. at 69.  As a Life Skills student, A.S. would complete a Capstone project at year end; this project is designed for students to experience "lots of socialization with peers and adults . . . , which is all linked with academic and transition goals." Id. at 70.

The special education teacher assigned to Life Skills (Ms. Joan Wright) testified regarding her extensive experience and training in dealing with autism and amplified on Dr. Mitchell's description of Life Skills. Day 4 (Wright) 61-98; Day 8 (Wright) 65-68.  She testified that she teaches not just academic subjects (reading, writing, mathematics, science and social studies),[10] but also life skills, personal care and health skills and daily living skills (such as making meals and snacks, cooking and making shopping lists), with the focus on students' gaining independence and becoming part of the community. Day 4 (Wright) at 68.  Life Skills occupies a spacious area that includes a kitchen, which is incorporated into the school activities, as well as a separate sensory room. Id. at 78.  Ms. Wright confirmed that all of A.S.'s fifth grade

---

[10] Depending on the student's individualized needs, some Life Skills students take some classes with neurotypical peers.  See Day 4 (Wright) 73-74.

IEP requirements and all of the Autism Project's recommendations for A.S. could be delivered in Life Skills. Id. at 92-96.

The testifying educators who were asked to opine regarding Life Skills uniformly testified that it would be an appropriate placement for A.S.'s sixth grade year. E.g., Day 2 (Zarcaro) at 60-61 (lower school principal and A.S.'s IEP Team member opines "I thought it was wonderful . . . really in tuned to individualizing for each and every student, but there were students that were still working together and had those opportunities"); Day 2 (Davila) at 109 (A.S.'s special education teacher and A.S.'s IEP Team member opines that Life Skills is "best for A.S., what A.S. needs, in working with him for the years that I have."); Day 4 (Brennan) at 51-53, 55 (adaptive physical education teacher and IEP Team member testifies that Life Skills can provide program that A.S. needs, including "a lot of social partnering . . . [and] a lot of verbal socialization"); Day 6 (Vendetti) at 33 (special educator coordinator who works with Life Skills students testifies that A.S. can receive individualized reading services from teacher experienced with ASD); Day 6 (Tsonos) at 50 (Ferri principal confirms that Life Skills program affords "opportunity to socialize or interact with neurotypical peers throughout the day"); Day 7 (Pine) at 43 (lower school social worker and a member of A.S.'s IEP Team concludes that "Mrs. Wright's life skills class would be an appropriate placement for A.S."); Day 8 (Harris) at 80-83 (social worker in Life Skills program testifies that she can serve A.S.'s social goals as described in fifth grade IEP); Day 9 (Storey) at 97-98 (speech/language pathologist and member of A.S.'s IEP Team observed Life Skills and testifies to socialization opportunities it would afford A.S., including student council, unified arts, basketball, sports, "stuff like that, with a neurotypical student").

Apart from the Parents, the only witness who testified that Life Skills would not afford A.S. with FAPE – Dr. Dinklage – conceded that he utterly lacked any knowledge of the program, including that he knows nothing of its emphasis on socialization and what it would offer A.S. Day 1 (Dinklage) at 147 ("I don't know about it."). Dr. Dinklage criticized the District's <u>fifth grade</u> social goals as needing "elaboration" so as to better reflect the "seriousness and the centrality of developing [A.S.'s] social skills." Day 9 (Dinklage) at 41-47. Nor did Ms. Nault (the home-based BCBA in charge of ABA), who also criticized the wording of the District's <u>fifth grade</u> social goals, offer an opinion on the appropriateness of the Life Skills program (or of Sargent). Day 5 (Nault) at 95-96.

As to the Parents, C.S. (A.S.'s father) testified that he observed Life Skills for three hours – he said that he did not see socialization and believed that he was not witnessing teaching staff with autism expertise; he also noted that the sensory room was in disarray when he was there. Day 1 (C.S.) at 66-67; Day 3 (C.S.) at 36. D.S. (A.S.'s mother) testified about the anguishing decisions that have faced her family regarding what would be best for A.S.; as to the District's Life Skills, she said only, "I don't feel like the socialization is like embedded into the curriculum, it's not upfront." Day 10 (D.S.) at 48. As C.S. summarized their perspective, based on past disappointments, the Parents do not trust that the District could deliver on the recommendations either of Dr. Dinklage or of the Autism Project. <u>Id.</u> at 73 ("from . . . the standpoint of the socialization piece, . . . I didn't witness it, I didn't see it myself, and continually through our history there's been lots of promises, and zero delivery").

C.   <u>Parents' Proposal for Sixth Grade – Sargent Rehabilitation Center</u>

The placement for which the Parents advocated – Sargent – was described by Ms. Collen McCarthy, its senior vice president of programs and professional services. Day 5 (McCarthy) at

131.  Sargent has a day school that serves students with neurological impairments, 80% of whom are diagnosed with moderate to severe ASD.  Id. at 133, 135.  Sargent has no students who are neurotypical.  Id. at 136.  Nor does Sargent "provide instruction . . . [using] the ABA approach." Id. at 139.  All of Sargent's students are referred by public schools (including some from the District).  Id. at 137.  Before the appropriateness of a student for Sargent can be assessed, Sargent must receive an intake referral from the public school district; the intake process is very thorough and in-depth.  Id. at 140-41, 147.

Ms. McCarthy testified that it was she who escorted A.S. and his family for two tours of Sargent and that "[i]t was a mistake" for her to have done so.  Day 5 (McCarthy) at 141. Although Ms. McCarthy met A.S. when he came for the tour, in terms of the appropriateness of Sargent as a placement for him, she and Sargent know nothing about A.S. and have never received any educational or medical records about him; as she explained, "until we get a referral from the school department, then we can't do anything for him."  Id. at 142-43, 146.  Ms. McCarthy did not (and could not with no information about A.S.) form the opinion that Sargent would be an appropriate placement for A.S.  Id. at 146-47.  Further, she testified that, "if the district can meet the needs, then the student would not be referred to the Sargent Center . . . [b]ecause that would be inconsistent with the [least restrictive environment regulations]."  Id. at 159.  Apart from confirming that Sargent emphasizes social functioning, Ms. McCarthy testified that she could not respond to whether Sargent could satisfy the recommendations in Dr. Dinklage's letter of November 15, 2018, id. at 162-63, although, when questioned about each recommendation decoupled from the opinion, she testified that she believed that Sargent could do each, id. at 165-69.

Dr. Mitchell, the District's Director of Special Services, testified that she is familiar with Sargent because the District has placed students there, as well as that she has visited, including in April 2019 specifically to review the appropriateness of Sargent for A.S.  Day 7 (Mitchell) at 137.  Based on her observations, particularly the absence of neurotypical peers, she opined that Sargent would not be an appropriate placement in light of the District's ability to "offer a free and appropriate public education in the least restrictive environment for A.S. here at Ferri Middle School, and give him the opportunities to be included with his peers and his community that is close to his home."  Id. at 139.  Every testifying educator who considered the appropriateness of Sargent expressed the same opinion.  See, e.g., Day 5 (Davila) at 35-38 (based on tour of Sargent as member of A.S.'s IEP Team, Sargent not appropriate because "no opportunity for inclusion with typical peers"); D Ex. 17 (based on tour of Sargent as member of A.S.'s IEP Team, Ms. Storey reports Life Skills has more opportunities than Sargent "with both neurotypical and neurodiverse peers").

Apart from the Parents, the only witness who opined that Sargent appeared to be appropriate – Dr. Dinklage – conceded that he had not recommended Sargent to the Parents and that he has never seen it and knows almost nothing about it.  When the Parents told him they were interested, he looked at the website and spoke to a colleague.  Based on this limited inquiry, he concluded that Sargent takes children with ASD, has a social skills curriculum and has a good reputation; therefore, he opined that Sargent "appears" to be appropriate for A.S.  Day 1 (Dinklage) at 99, 141-145.

As the basis for their advocacy for Sargent, the Parents relied only on their observations during the handful of tours with Ms. McCarthy.  For example, C.S. (A.S.'s father) testified that he thought the children he saw at Sargent seemed similar to A.S., while D.S. (A.S.'s mother)

testified that Sargent seemed to have socialization embedded upfront.  Day 10 (D.S.) at 47.  As D.S. explained, "I asked just to try it for a year.  I didn't ask – I don't want my son to stay in a school like this permanently.  This is not what I want.  I want to try and just see if it helps."  Id. at 49-50

        D.     <u>Hearing Officer's Decision</u>

The Hearing Officer's decision is a fifty-six-page summary of the testimony, his findings, analyses and conclusions.  As foundational matters, the decision notes that the Parents raised no procedural concerns and that the issues were limited to A.S.'s sixth grade program, that is whether, as the Parents contended, the District failed to provide FAPE by refusing placement at Sargent, or whether, as the District argued, placement at Life Skills will provide FAPE.  HO Dec. 4, 50.

The Hearing Officer accepted the Parents' principal witness, Dr. Dinklage, as an expert in neuropsychology, and found that the District relied on his neuropsychological evaluations, accepted all of his test results and considered his recommendations for A.S.'s education.  Id. at 20, 52, 55.  The Hearing Officer further found that Life Skills is a "substantially separate school program"; as such, it is essentially what Dr. Dinklage was proposing.  Id. at 55.  Otherwise, the Hearing Officer discounted Dr. Dinklage's opinion that the District could not provide A.S. with FAPE in sixth grade as unpersuasive because it was based on the IEP that had been finalized for fifth grade and on his observation of the fifth grade.  Id. at 52-53.  As he had conceded during his testimony, Dr. Dinklage knew nothing about Life Skills or the socialization it could provide A.S. Id. at 53.  Similarly, the Hearing Officer found that the testimony of Ms. Nault, the home-based ABA, was "not at all persuasive" due to her lack of background in social work and her complete lack of knowledge regarding Life Skills.  Id. at 53.  Otherwise, all of the witnesses were the

educators to whose expertise and judgment the Hearing Officer deferred.  Id.  The Hearing Officer found that the testimony of these witnesses uniformly supports the proposition that Life Skills can meet A.S.'s needs, including his need for socialization to be "front and center," as Dr. Dinklage urged, while Sargent could not meet IDEA's LRE requirement because it has no students who are neurotypical peers.  Id. at 53-56.

Pivotal to the Hearing Officer's decision was his finding that the last IEP meeting, held on May 15, 2019, was for the purpose of developing the IEP and determining placement for sixth grade and that this meeting "was ended by the Parents," who "created an impass[e] . . . by not allowing the team to develop a program which would have included discussions about an out-of-district placement"; the Parents took a "single minded approach" and ended the meeting by leaving.  Id. at 49.  Therefore, the Hearing Officer found "that the incomplete IEP was created by the Parents' refusal to allow the Team to properly develop the IEP for 6th grade," that the Parents "knew or should have known that the IEP of April 1, 2019, had to be completed for the Student's 6th grade," while the District "did act expeditiously."  Id. at 49-50.  Based on these findings, the Hearing Officer relied on facts outside the incomplete IEP (principally the testimony of the Parents and knowledgeable educators) to determine what the District was offering for sixth grade and whether it amounted to FAPE.  Id. at 50.  In so doing, the Hearing Officer noted that there had been testimony about the District's "settlement proposal" for sixth grade (Joint Exhibit 1), but that he had "not consider[ed] that proposal because it was not evident that it was developed by the IEP process."  Id. at 52.

As confirmed during the hearing before me, the Parents do not contend that the Hearing Officer made any errors of law.

**IV.     Additional Evidence – Joint Exhibit One**

The Parents have moved to supplement the record with "additional evidence," which has been marked as Joint Exhibit 1.  The District vociferously objects.

The genesis of Joint Exhibit 1 goes back to just before the due process Hearing began, when the Hearing Officer directed the District to provide the Parents with a proposed program for A.S.'s sixth grade year in an attempt to settle the dispute.  The District complied, providing the Parents with a one-page document outlining in bullet points a proposed program based on placement in Life Skills; this outline is Joint Exhibit 1.  To supplement Life Skills, Joint Exhibit 1 proposes individualized reading instruction from a special educator with ASD teaching experience; clinical psychological and educator/curriculum consultation from agreed upon ASD professionals; one-on-one behavioral support with agreed-upon BCBA supervision; and opportunities for socialization with neurotypical and like peers during lunch, after-school activities (such as sports), itinerants and appropriate academic classes.  See Joint Ex. 1.  Joint Exhibit 1 tersely makes clear that the sixth-grade plan would include "Social work, OT, SLP services."  Id.  The Joint Exhibit 1 compromise was rejected by the Parents and the Hearing began a few days later.

Without objection from the District,[11] on the first Hearing day, the Parents marked this one-page outline as "Joint Exhibit 1" and presented it to their first witness, C.S., who is A.S.'s father.  Day 1 (C.S.) at 62-64.  C.S. testified that he had seen Joint Exhibit 1, understood it to be the District's pre-hearing proposal, but did not believe that it would satisfy A.S.'s needs because it offered many services and compromises that had not been offered while A.S. was at Winsor Hill Elementary.  Id. at 67-73.  Further, based on his knowledge of A.S.'s education at Winsor

---

[11] The Court observes that the District could have objected to its compromise proposal being used by the Parents to examine their witnesses.  See Fed. R. Evid. 408.  It did not; instead, it began to rely on Joint Exhibit 1 in its direct examination of its own witnesses.

Hill Elementary and his own one-time observation of Life Skills, C.S. expressed skepticism that the District could deliver what was outlined in Joint Exhibit 1 because, in his opinion, its staff lack "expertise in autism."  Id.  C.S. also testified that, as far as he could tell, the Joint Exhibit 1 proposal did not "match" the recommendations of the Autism Project or Dr. Dinklage.  Id.  Joint Exhibit 1 was not offered as an exhibit.

The Parents' next witness, Dr. Dinklage, testified that he had been provided with a copy of Joint Exhibit 1 a few days before his testimony.  Without objection from the District, he testified regarding the proposal: "there are certainly parts of this that appear appropriate, and even the mix of kids he might be with, you know, sounds reasonable in the description."  Day 1 (Dinklage) at 95-96.  His only criticism of the one-page outline was that it did not adequately "characterize the seriousness and how comprehensive the social skills intervention needs to be," id. at 96, as well as its "lack of putting the social curriculum front and center, or even using the word social in the proposed program," id. at 144.  After cross-examination by the District established that Dr. Dinklage has done nothing to find out what Life Skills could actually offer regarding socialization to give content to the truncated outline in Joint Exhibit 1, id. at 144-52, the Hearing Officer himself questioned Dr. Dinklage directly regarding whether he found the Joint Exhibit 1 outline to be inadequate simply as a matter of semantics:

> THE HEARING OFFICER:  Are you telling this hearing officer that opportunities for interaction with neurotypical and like peers during lunch and school activities is objectionable because of how it's worded?
>
> THE WITNESS:       No.  What it did to me is it echoed what I observed the year before, last year, where he was given what would be called opportunities for interactions with neurotypical peers, and he was trooped through a regular classroom.
>
> THE HEARING OFFICER:  So it's not this.  This keyed you into something else?

THE WITNESS:        It keyed me, because *it doesn't say enough*.

Id. at 153 (emphasis supplied).  Joint Exhibit 1 remained marked for identification and was not

offered in evidence.

In their case in chief, the Parents also called Ms. Zarcaro (the principal of Winsor Hill

Elementary), Ms. Davila (A.S.'s primary educator from second through fifth grade), Dr. Mitchell

(the District's Director of Special Education), and Ms. Nault (the BCBA in charge of home-

based ABA) but did not ask any of them about Joint Exhibit 1.

During the District's case in chief, Joint Exhibit 1 was shown to Ms. Davila, A.S.'s

special education teacher.[12]  Day 2 (Davila) at 75-83.  She was asked to opine[13] whether it

proposed a sixth-grade program that would be appropriate for A.S.  Id. at 108-09.  She

responded, "it's what is best for A.S., what A.S. needs, in working with him for the years that I

have."  Id. at 109.  Next the District presented Joint Exhibit 1 to Ms. Donna Vendetti, the

District's student support coordinator who supports the Life Skills students.  Day 6 (Vendetti) at

35.  Ms. Vendetti confirmed that she had never seen the document but agreed that the District

would be able to provide the bullet point calling for "individualized reading services . . . with a

special educator who is also an interventionist trained on reading programs and who has

experience teaching students with autism spectrum disorder."  Id. at 36.  Immediately following

that answer, the Hearing Officer called for an off-the-record conference with the parties.  When

they went back on the record, the Hearing Officer announced that "Joint Exhibit 1 is hereby

withdrawn by the parties."  Id. at 37.  During the hearing before me, the parties confirmed that

---

[12] The District's attorney represented to Ms. Davila that Joint Exhibit 1 had been admitted as a full exhibit.  Day 2 (Davila) at 108.  The Court has scoured the record and this representation does not appear to be accurate; Joint Exhibit 1 was marked but never offered and not admitted.

[13] The Hearing Officer subsequently found Ms. Davila qualified to testify as an expert in the field of special education.  Day 5 (Davila) at 10-11.

the decision to withdraw Joint Exhibit 1 was made jointly.  Counsel for the Parents advised me

that she agreed to withdraw it because she did not realize how important Joint Exhibit 1 was until

afterwards.

On Day 8 of the Hearing, the parties returned to the problem of Joint Exhibit 1 because

the Parents asked to be able to recall Dr. Dinklage to have him testify to his opinion of the April

1, 2019, IEP, P Ex. 20; D Ex. 15, which was the final IEP for fifth grade, but was still inchoate

for sixth grade.  The District strenuously objected.  After a lengthy argument, the Hearing

Officer ruled that Dr. Dinklage could be recalled.  Day 8 at 93.  On Day 9, Dr. Dinklage testified

to his (mistaken, as all other witnesses confirmed) impression that the April 1, 2019, IEP that he

had just been shown was final for sixth grade and to his opinion that it would not provide FAPE

because its emphasis did not establish socialization as "front and center."  Dr. Dinklage testified

that the wording of the fifth grade IEP caused him to question whether the District "appreciate[d]

the centrality of [A.S.'s] social needs" for sixth grade.  Day 9 (Dinklage) at 17, 28-60.

In his decision, the Hearing Officer explained that the proposal in Joint Exhibit 1 was not

considered "because it was not evident that [Joint Exhibit 1] was developed by the IEP process."

HO Dec. 52.

Mindful that IDEA provides for consideration of "additional evidence" as a hedge against

injustice, Roland M., 910 F.2d at 997, the Court has exercised its discretion to accept Joint

Exhibit 1 and to consider it as evidence bearing on what might be included in a sixth grade IEP

for A.S., which could be implemented at Life Skills.  Text Order of Mar. 9, 2021.  With

testimony regarding Joint Exhibit 1 already elicited by both the Parents and the District from

various witnesses, and no need for further testimony, as the Parents represented during the

hearing before me, consideration of Joint Exhibit 1 will not convert this case from review of the

Hearing Officer's decision into a trial *de novo*.  The District's argument that it should be

excluded is based on the fear that the Court will misinterpret Joint Exhibit 1 as a substitute for

the sixth grade IEP or it will wrongly treat Joint Exhibit 1's bullet points and tersely stated

services ("Social work, OT, SLP services") as evidence that the District has refused to put

socialization "front and center."  That fear is groundless.  Joint Exhibit 1's provenance is clearly

described by the representations of counsel who agree that it was created at the direction of the

Hearing Officer to provide the Parents with an outline of what might be included in a to-be-

developed IEP, all of which could be implemented with placement at Life Skills.  As such, it

may and should be considered as part of the totality of the plethora of evidence regarding A.S.'s

proposed sixth grade program.  In so doing, the Court must determine whether and how adding

Joint Exhibit 1 to the mix impacts the persuasiveness of the Hearing Office's decision.

## V.    Analysis

The outcome of this case boils down to whether a preponderance of all of the evidence

(including Joint Exhibit 1) supports the Hearing Officer's finding that placement in the District's

Life Skills is an appropriate foundation for developing a sixth grade IEP with an adequate focus

on socialization so as to provide FAPE with respect to A.S.'s socialization needs.  I find that it

does.  Whether A.S. was denied FAPE by his pre-sixth grade IEPs' lack of socialization goals[14]

or by the District's pre-sixth grade decision (in which his Parents concurred) to provide academic

instruction in an isolated setting is not now in issue.  The only question before the Court is

whether the District's decision to offer Life Skills, a substantially separate program primarily

serving autistic children that appears to align precisely with what Dr. Dinklage recommended, is

---

[14] To be precise, prior to fifth grade, A.S. had communication and behavioral goals in his IEPs, but not specific socialization goals.  Midway through fifth grade, socialization goals were added, although Dr. Dinklage and Ms. Nault did not consider them adequate.

sufficient for FAPE.  Ironically, Dr. Dinklage himself confirmed its appropriateness based on what he saw in Joint Exhibit 1, when he grudgingly conceded that "parts" of Life Skills "appear appropriate" and that the "mix of kids . . . sounds reasonable" and criticized the District's socialization proffer (intentionally presented as a truncated outline) only because "it doesn't say enough."  Day 1 (Dinklage) at 95-96, 150-53.  All of the educators asked to opine concurred that Life Skills, with a sixth grade IEP built on the fifth grade IEP and/or consistent with the proposal in Joint Exhibit 1, has the elements and opportunities to put A.S.'s socialization needs "front and center" as Dr. Dinklage suggested; no witness with knowledge of Life Skills testified that it does not.

Recognizing that the Court's obligation is independently to weigh the evidence, albeit with due weight afforded to the Hearing Officer's findings, I find that the detailed testimony of the educators regarding Life Skills and its particular emphasis on socialization, starting with Ms. Wright, who has presided over Life Skills for more than twenty years and has significant training and experience in educating children with mild to severe ASD, is more than sufficient to demonstrate by a preponderance that socialization will be "front and center" for A.S. at Life Skills.  While the precise contours of A.S.'s socialization plan remain to be fleshed out through the development of the sixth grade IEP, I find that the Hearing Officer was correct in deciding that A.S. can be provided FAPE at Life Skills.  Further, this finding – that A.S. can receive a FAPE-compliant education at the community-based public school with like and neurotypical peers – also supports the Hearing Officer's corollary conclusion that Sargent's limited student body (with no neurotypical peers) means that it cannot meet IDEA's LRE mandate because the home district can meet the child's needs.  Ms. McCarthy, Sargent's senior vice president,

confirmed this finding, as did every testifying educator with knowledge of the program who was asked to opine about Sargent.  No witness testified otherwise.

To counter the force of these conclusions, the Parents present an array of arguments. None hold water.

First, the Parents aim a blunderbuss at the Hearing Officer's treatment of three witnesses – Dr. Dinklage, the expert neuropsychologist; Ms. Nault, the BCBA in charge of A.S.'s home-based ABA program; and Ms. McCarthy of Sargent.

Focusing on Dr. Dinklage, they begin with the contention that the Hearing Officer ignored the District's failure to provide FAPE because it did not procure its own neuropsychological evaluations.  The problem, as the Parents concede, is that IDEA clearly permits the District to rely on Dr. Dinklage's neuropsychological evaluations.  20 U.S.C. § 1414(c)(1)(A)(i); see Hudson by & through Tyree v. Wilson, 828 F.2d 1059, 1065 (4th Cir. 1987) (if parents obtain private testing, local schools may use results without corroborating them); Carroll v. Capalbo, 563 F. Supp. 1053, 1057 (D.R.I. 1983) (school system may rely on evaluation performed privately).  The Parents nevertheless argue that the District needed to procure its own neuropsychological testing[15] because the District did not consistently agree with and adopt all of Dr. Dinklage's educational recommendations.  The Parents buttress this argument with the contention that the Hearing Officer committed this error because he categorically disregarded Dr. Dinklage's testimony and gave no weight to Dr. Dinklage's credentials.  ECF No. 36-1 at 25-26.

The argument fails because, as Dr. Mitchell and other witnesses explained, the District consistently accepted all of Dr. Dinklage's neuropsychological clinical observations, test results

---

[15] As far as the record reveals, this is not something that the Parents ever requested or even suggested over the many years that the District relied on Dr. Dinklage's neuropsychological evaluations of A.S.

and diagnoses and consistently considered them in developing IEPs.  Further, while in some

years, the IEP Team decided not to adopt all of Dr. Dinklage's educational recommendations,[16]

for the period in issue in this case (sixth grade), the District agreed with and was prepared to

adopt all of Dr. Dinklage's recommendations, implemented through placement at Life Skills.

E.g., Day 7 (Mitchell) at 78.[17]

The Parents' related contention that the Hearing Officer ignored Dr. Dinklage and his

credentials is simply untrue – like the District, the Hearing Officer found Dr. Dinklage to be an

expert in his field of neuropsychology and gave great weight to his professional opinions.  HO

Dec. at 20-24.  He only discounted Dr. Dinklage's opinion regarding the respective strength of

Life Skill's and Sargent's socialization programs based on Dr. Dinklage's candid admission that

he knew absolutely nothing about Life Skills and almost nothing about Sargent.  Id. at 53; see

Pass v. Rollinsford Sch. Dist., 928 F. Supp. 2d 349, 373 (D.N.H. 2013) ("court cannot accord

substantial weight to [neuropsychologist's] opinion" because "he was unfamiliar with the S-

Cubed program, and that he had not had the opportunity to observe either Somersworth High

School or [student] in that setting").  Notably, as Dr. Dinklage himself conceded when pressed

by the Hearing Officer, he endorsed the bones of the District's proposal outlined in Joint Exhibit

---

[16] For example, in 2016, based on other data, principally, "[t]he functional measures . . . [c]lassroom-based measures, specialist measures, behavioral measures, et cetera," Dr. Mitchell testified that the District agreed with and accepted all of Dr. Dinklage's clinical findings and test results, but disagreed with his educational recommendation for "a substantially separate school program for Autistic children."  Day 4 (Mitchell) at 10-13 (referencing P Ex. 4).  Ironically, in August 2016, Dr. Dinklage himself withdrew that recommendation at the request of the Parents.  D Ex. 75.

[17] Dr. Mitchell specifically testified that the District agreed with all of Dr. Dinklage's clinical findings and test results, as well as with his recommendations for sixth grade, all of which she opined can be implemented with a Life Skills placement: "we can offer a free and appropriate public education in the least restrictive environment for A.S. here at Ferri Middle School, and give him the opportunities to be included with his peers and his community that is close to his home."  Day 7 (Mitchell) at 74-79, 139, 146.  Ms. Zarcaro corroborated this testimony, explaining that, during the IEP planning process that followed Dr. Dinklage's 2018 recommendations, A.S.'s socialization needs "became a really big focus," that is, "front and center" as Dr. Dinklage had recommended.  Day 2 (Zarcaro) at 22-23, 28-29.

1, quibbling only with depth and development of the wording, just as he critiqued the fifth grade IEP (which was the pending draft for sixth grade) because of the wording of the social goals. By contrast, the Hearing Officer rightly credited the testimony of Ms. Davila and other educators as to the appropriateness of Life Skills and the inappropriateness of Sargent, because they opined based on direct familiarity with both programs.

During the hearing before me, the Parents presented another related argument: that the Hearing Officer should not have credited the testimony of the District's educators who opined that the Life Skills program could meet A.S.'s socialization needs because none of them had any idea what was in Dr. Dinklage's evaluations. This is simply wrong. The longitudinal record is replete with references to the educators' consideration of Dr. Dinklage's work. To take the most relevant example, the meeting notes for the first of the five IEP meetings during A.S.'s fifth grade year expressly reference Dr. Dinklage's evaluation and his subsequent letter regarding his observation: "Dr. Dinklage's report from his observation was reviewed. The recommendations in his report were considered." D Ex. 29. Present at that meeting were three of the District educators who subsequently opined that Life Skills could meet A.S.'s socialization needs: Dr. Mitchell, Ms. Davila and Ms. Brennan. Further, Ms. Zarcaro and Ms. Storey both confirmed their awareness of Dr. Dinklage's assessments. Day 2 (Zarcaro) at 16-17; Day 9 (Storey) at 114. In short, these educators[18] were unambiguously aware of the content of Dr. Dinklage's evaluations.

---

[18] The testifying educators who did not have familiarity with Dr. Dinklage's work were largely those based in the Middle School who were not members of the IEP Team, and either had not yet worked with A.S. or had not worked with him in many years – Mr. Mathew Tsonos, the principal of Ferri Middle School, Ms. Michelle Harris, the Ferri Middle School social worker, Ms. Vendetti, the District's school support coordinator based in the Middle School, and Ms. Wright, the Ferri Life Skills special education teacher. The focus of their testimony is on describing Life Skills and its emphasis on socialization. Only Ms. Vanessa Pine, the social worker who joined the IEP Team in 2018, testified that from her perspective as a social worker, she agreed with Dr. Dinklage's recommendation that socialization should be "front and center," but also said that she had not seen Dr. Dinklage's 2018 evaluation or observation letter. Day 8 (Pine) at 46, 56-58, 63. The Hearing Officer himself thoughtfully followed up on this

Regarding Ms. Nault, the Parents hotly dispute the Hearing Officer's finding that Ms. Nault's testimony was "not at all persuasive."  HO Dec. at 53.  This argument is puzzling because Ms. Nault did not opine on the appropriateness of either Life Skills or Sargent.  To the contrary, her testimony focused on her disagreement with the adequacy of the benchmarks used by the fifth-grade social worker (Ms. Pine) in articulating the social goals for fifth grade IEP. Day 5 (Nault) at 70-76, 96.  With the testimony of the social worker explaining (based on her expertise as a social worker and her consultations with Parents and teachers) why she wrote them as she did, including that she made edits based on Ms. Nault's input, Day 8 (Pine) at 16-37, the Hearing Officer discounted Ms. Nault's criticism because of her lack of background in social work.  HO Dec. at 53.  With the details of the social goals in the sixth grade IEP still to be developed and mindful that the District's social worker was willing to and did carefully consider Ms. Nault's input for the wording of the fifth-grade goals, this argument does not advance the Parents' cause.

Regarding Ms. McCarthy,[19] the Parents' assertion that the Hearing Officer afforded her testimony no weight is not accurate.  The Hearing Officer did not find that Sargent is incapable of educating children diagnosed with ASD; to the contrary, he specifically found that Sargent emphasizes communication and puts its students' social goals "front and center."  Id. at 8. Rather, his finding that Sargent does not comply with IDEA in A.S.'s individualized circumstances rests on the District's ability to provide FAPE at Life Skills, which is the least restrictive environment, as Ms. McCarthy specifically confirmed.  Indeed, she testified that, with

---

admission, procuring the clarification that, as a professional trained as a social worker, review of neuropsychological findings is "not a daily thing I would do, [n]or was it part of my clinical training, but reports can be helpful in understanding a student."  Day 8 (Pine) at 64.

[19] Ms. McCarthy was not called by the Parents; rather, she was subpoenaed to testify by the District.  Day 5 (McCarthy) at 129.

no neurotypical students, Sargent cannot meet the LRE mandate of IDEA when, as here, the District can meet the student's needs.  Day 4 (McCarthy) at 159 (1384).  Thus, the Hearing Officer fully credited Ms. McCarthy's testimony and appropriately relied on it in his decision. HO Dec. 7-8, 56.

The Parents second major argument is focused on what they contend are the District's prior failures to include socialization goals in A.S.'s IEPs for first through fifth grades; they contend that these failures harmed his social development and limited his ability to succeed in other aspects of his education.  The Parents concede that none of this is directly in issue; rather, they asked the Hearing Officer, and now ask this Court, to consider this history as relevant to show that nothing will change going forward.  Day 8 at 61-62.  However, apart from its questionable relevancy to a case that is focused on the adequacy of the IEP for sixth grade and not on FAPE during grades one through five, the premise is faulty in that both A.S.'s lack of socialization goals in the prior IEPs (with reliance instead on embedded socialization) and A.S.'s placement in the relatively isolated classroom with Ms. Davila were hotly debated and ultimately decided through an IEP process in which the Parents were active and engaged participants; these were difficult decisions in which the Parents concurred (and which Dr. Dinklage himself reluctantly endorsed, D Ex. 75), until Dr. Dinklage's 2018 report, as supplemented on November 15, 2018, raised the alarm about the need for a change.  Further, A.S. made progress with socialization over these years, as established by the testimony of the educators.  E.g., Day 2 (Davila) at 84; Day 9 (Storey) at 94.  This evidence undermines the proposition that A.S. did not receive FAPE during the prior period.  See Pass, 928 F. Supp. 2d at 373 (because "social skills progressed" and student "unequivocally benefitted," court finds that past social instruction was appropriate).

32

The Parents' effort to buttress this argument with the assertion that the District did not offer social worker services until after the due process Hearing was requested also falls flat. The evidence demonstrates that, immediately following receipt of Dr. Dinklage's letter with the clarion call for socialization to be "front and center," the District raised the possibility of adding social worker services and called in the Autism Project for consultation. D Ex. 29. By the February 15, 2019, IEP meeting, the social worker had done baseline testing and drafted goals and the Autism Project report had been procured. D Ex. 27. As of April 1, 2019, social skills goals and social worker services were added to the IEP. D Ex. 15; P Ex. 20. Thus, the preponderance of the evidence establishes that the District's shift to increase the emphasis on socialization by adding the social worker to the Team and asking for an assessment from the Autism Project was triggered by Dr. Dinklage's 2018 evaluation and observation letter and not by the Parents' decision to ask for placement at Sargent, which the District did not learn of until the April 1, 2019, IEP meeting, D Ex. 23, nor by the Parents' decision to engage an attorney, which the District did not learn of until April 8, 2019, P Ex. 60, nor by their filing of the request for an impartial due process hearing, which did not happen until June 2019.

The Parents' third reason for challenging the Hearing Officer's decision is their disagreement with the Hearing Officer's finding that they obstructed the creation of the sixth grade IEP by walking out of the May 15, 2019, IEP meeting. There is no doubt that the Hearing testimony was exceedingly jumbled regarding the scope of the April 1, 2019, IEP, until the seventh hearing day when Dr. Mitchell finally clarified[20] that, as of the April 1, 2019, IEP

---

[20] As Dr. Mitchell explained: "[t]he normal progression of the development of the IEP is to discuss the strengths and needs of the student, and then discuss the goals, with full participation from team members, which the parents are an important part, [a]nd then to take those goals and services and determine service time and the location. Meaning, whether or not those services would be provided in the general education setting or in the special education setting. And then the last step to that process would be the actual placement for the student, and there would be a conversation about that. And so the district didn't have the opportunity to be able to go through the steps in the process and propose the location for the services." Day 7 (Mitchell) at 61.

meeting, the IEP embodied in District Exhibit 15 was implemented just for the rest of fifth grade, with the sixth grade IEP and placement remaining to be determined.  Day 7 (Mitchell) at 54-56. The record is further pellucid that the purpose of the May 15, 2019, IEP meeting was "to discuss the 6th grade program" and to "develop the IEP for A.S.'s 6th grade," as well as that the District "repeatedly attempted to present the draft IEP" during the meeting.  D Ex. 17; Day 7 (Mitchell) at 52, 54; see T.B. ex rel. N.B., 2003 WL 22069432, at *5 (until IEP is complete, no placement can be made).  It is equally clear that it was the Parents and their attorney who stopped the IEP development discussion once the attorney confirmed with each of the District's Team members that she believed that Life Skills would be an appropriate placement and Sargent would not: as the attorney advised the Hearing Officer during the Hearing, "when I met with the team, I didn't allow them to put a plan on . . . *I stopped it*."  Day 1 at 71 (emphasis supplied).  As a result of this action on behalf of the Parents, "[t]he IEP has not been developed yet."  D Ex. 16.  In short, the evidence supporting the Hearing Officer's finding is ample if not overwhelming, while the Parents point to no contrary evidence.[21]  The Hearing Officer's finding is further corroborated by the Parents' insistence that they want the Court to consider evidence extraneous to the April 1, 2019, IEP – Joint Exhibit 1 – effectively as a surrogate for the to-be-developed sixth grade IEP, which was not completed because of their obstruction.

When all of the evidence is sifted, the Parents' argument seems to rest on their lack of trust that the District can deliver FAPE in light of what, in hindsight, seems to them to be prior failures adequately to emphasize A.S.'s need for socialization.  However, the law is clear that

---

[21] The Parents' attorney argued before me that the Parents expected to discuss placement at the May 15, 2019, IEP meeting and "dispute the District's contention that the purpose of meeting held on May 15, 2019 was to develop an IEP for the 2019-2020 IEP."  ECF No. 36-1 at 36-37.  They point to no evidence of this fact; instead, they reference only the undisputed fact that, at the preceding IEP meeting, they had asked the Team to consider Sargent as a placement "ASAP."  D Ex. 23.

"deciding upon which goals and methods to include in any student's IEP is not an exact science, and allowing parents to second guess IEP decisions after it has expired would only undermine the process of providing students with the educational services they need." Doe ex rel. Doe v. Hampden-Wilbraham Reg'l Sch. Dist., 715 F. Supp. 2d 185, 194-95 (D. Mass. 2010).  While their emotional reaction to the challenges they have courageously faced and continue to shoulder as parents of a child with ASD is understandable, past disappointments do not amount to evidence that the District's different approach for the sixth grade will not provide A.S. with FAPE, as the preponderance of the Hearing and additional evidence establishes.

There is no question that the Parents' evidence raises concerns whether, during the period not in issue, the District was sufficiently focused on pushing A.S. to engage socially with like and neurotypical peers.  However, when Dr. Dinklage elevated this concern in 2018, the District promptly responded, bringing in the social worker, ordering the Autism Project assessment and incorporating the resulting recommendations into A.S.'s IEP for the remainder of fifth grade with a plan for sixth grade in Life Skills, which the evidence establishes is not only consistent with Dr. Dinklage's recommendation for a substantially separate placement with socialization "front and center," but which also has all of the elements needed to implement an IEP that will afford A.S. with FAPE in the least restrictive environment.  Therefore, I recommend that the Parents' motion be denied and that the District's motion be granted.

## VI.   Conclusion

For the foregoing reasons, I recommend that the Parents' motion for summary judgment (ECF No. 36) be denied and the District's cross-motion for summary judgment (ECF No. 42) be granted.  Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days of its receipt.  See Fed. R. Civ. P.

72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision. See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan_____
PATRICIA A. SULLIVAN
United States Magistrate Judge
March 9, 2021